IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MARIA TERESA MEDINA, <br><br> Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS <br><br> Case No. 2:13-CR-140 TS <br><br> District Judge Ted Stewart |

This matter is before the Court on Defendant's Motion to Suppress.[1] As explained more fully below, the Court will deny Defendant's motion.

I. BACKGROUND

On February 5, 2013, Officer Loveridge stopped a vehicle operated by Defendant, due to a broken tail light. While Officer Loveridge was executing the stop, Officer Smith arrived at the scene with his narcotics detection dog, Jip. Officer Loveridge observed numerous air fresheners and a suspicious amount of luggage in Ms. Medina's vehicle. As such, while he ran a check on Defendant's driver license, Officer Loveridge asked Officer Smith to deploy Jip. When Officer Smith walked Jip around Defendant's vehicle, Jip initially alerted on the driver's side of the vehicle, then indicated on the rear driver's side door by scratching. A search of Defendant's vehicle yielded a sizable amount of methamphetamine. Defendant was indicted on March 6, 2013, with one count of intent to distribute five hundred grams or more of methamphetamine, in violation of 21 U.S.C § 841.

---

[1] Docket No. 42.

Defendant moved to suppress the evidence seized during the search.  A hearing was held before this Court on December 16, 2013.  At the hearing, the government presented the following three witnesses: (1) Sergeant Wendell Nope, who is the Training Supervisor at Utah's narcotics detection dog training facility; (2) Officer Loveridge; and (3) Officer Smith.  Defendant presented a competing expert witness, Steven Nicely.

Defendant filed a memorandum in support of the Motion on February 10, 2014, the government filed its opposition brief on March 18, 2014, and Defendant filed a reply memorandum on April 1, 2014.

## II.  LEGAL STANDARD

When evaluating routine traffic stops, "the court must make a dual inquiry: (1) was the traffic stop justified at its inception, and (2) was the detention 'reasonably related in scope to the circumstances which justified the interference in the first place.'"[2]  "A traffic stop is justified at its inception if an offer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction."[3]  "An investigative detention may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires a 'reasonable suspicion' of criminal activity, that is to say the officer must acquire a 'particularized

---

[2] *United States v. Delgadillo*, No. 2:09-CR-108, 2009 WL 3561882, at *9 (D. Utah Oct. 22, 2009) (quoting *United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir. 1997)).

[3] *United States v. Kitchell*, 653 F.3d 1206, 1216 (10th Cir. 2011) (quoting *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009)).

and objective basis for suspecting the particular person stopped of criminal activity.'"[4]  "The use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view'—during a lawful traffic stop, generally does not implicate legitimate privacy interests."[5]  An alert from a reliable narcotics detection dog generally provides probable cause to support a vehicle search.[6]

"A party seeking to suppress evidence found during a search after a positive dog alert bears the burden of proving that the dog is unqualified."[7]  When determining whether a narcotics detection dog's sniff provided an officer with probable cause, the Court must determine "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."[8]  "In evaluating whether the State has met this practical and common-sensical standard, [courts] have consistently looked to the totality of the circumstances."[9]

> A defendant . . . must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses.  The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty.  So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings.

---

[4] *United States v. Villa-Chaparro*, 115 F.3d 797, 801–02 (10th Cir. 1997) (quoting *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995); *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997)).

[5] *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

[6] *Florida v. Harris*, 133 S. Ct. 1050, 1057–58 (2013).

[7] *Kitchell*, 653 F.3d at 1224.

[8] *Harris*, 133 S. Ct. at 1058.

[9] *Id.* at 1055.

> Indeed, evidence of the dog's (or handler's) history in the field . . . may sometimes be relevant. And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.[10]

### III. DISCUSSION

Officer Loveridge testified that he stopped Defendant's vehicle due to a broken tail light[11] and Defendant does not contest this assertion. Therefore, the traffic stop was justified at its inception. Officer Loveridge also testified that Officer Smith deployed Jip to conduct a sniff of Defendant's vehicle while Officer Loveridge was in the process of conducting the traffic stop.[12] Defendant also does not contest the decision to deploy Jip. Rather, Defendant argues that Jip's alert did not establish probable cause to support a search of Defendant's vehicle.

Defendant has introduced expert testimony to challenge (A) Utah's dog certification and training program and (B) Jip's reliability in particular based on his own training performance. The government asserts that Defendant's expert is not credible and has introduced its own expert testimony to demonstrate that Jip's training and performance indicate reliability sufficient to support probable cause.

### A. STATE CERTIFICATION PROGRAM

Defendant argues that Utah's program is inadequate to produce reliable narcotics detection dogs. Defendant asserts that Jip has an accuracy rate of approximately 75% and that

---

[10] *Id.* at 1057–58.

[11] Docket No. 51, at 53.

[12] *Id.* at 54–55.

"[t]he state training facility is capable of producing dogs that perform at a much higher level."[13] Specifically, Defendant argues that the State's program is inadequate because its standards for certification are too low, the grading method leads to ineffective training, it does not include adequate training in real-life scenarios, it does not include protocols to prevent producing dogs that are susceptible to cuing, and it risks training dogs to indicate to receive a reward rather than to indicate in response to the presence of narcotics.

"[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."[14]

The Tenth Circuit has deferred to the superior expertise of canine professionals in evaluating the adequacy of training procedures: "[C]anine professionals are better equipped than judges to say whether an individual dog is up to snuff. . . . Of course, if a credentialing organization proved to be a sham, its certification would no longer serve as proof of reliability."[15]

Defendant does not assert that Utah's credentialing organization is a sham. Rather, Defendant argues that there is room for improvement in the training protocols. But it does not necessarily follow that an imperfect training program produces unreliable dogs—reliability does

---

[13] Docket No. 53, at 6.

[14] *Harris*, 133 S. Ct. at 1057.

[15] *United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011).

not mean perfection.[16] Nor does it follow that a certified narcotics detection dog's alert would not cause a reasonably prudent person to expect a search to reveal contraband just because the dog's certification program had potential areas of improvement.

The government presented testimony explaining that Utah's training program is a 320-hour course conducted over eight weeks, culminating in a 24–48 hour certification exam. Every twelve months thereafter, each dog must complete the certification exam again. The government also presented testimony indicating that many states, cities, governmental agencies, and foreign governments have adopted the same training and certification standards used in Utah. According to Sergeant Nope, "when a dog is graded at a four in this program used by the State of Utah, that is actually comparable to other organizations that issue an even higher score. We grade hard in the State of Utah."[17] Whatever its imperfections, Utah's program is not a sham.

For example, Defendant argues that Utah's program is fatally flawed because handlers—who themselves are being trained—grade their own dog's performance. Defendant's characterization of the grading system conflicts with Sergeant Nope's testimony. And given Sergeant Nope's high-level role in Utah's program, the Court credits his testimony on this point. The program involves a series of stations presenting different training scenarios. At each station, an adjunct instructor evaluates the dogs' performance. Early in the program, the adjunct instructor is involved in ensuring that the handler accurately assesses his dog's and his own performance. As the program continues and the handler develops a level of reliability and skill

---

[16] *See, e.g.*, *United States v. Guitierrez-Ruiz*, No. 2:10-CR-137 DAK, 2011 WL 129632, at *7 (D. Utah Jan. 14, 2011) ("[A] less than perfect success rate does not undermine[] a dog's reliability." (citing *Caballes*, 543 U.S. at 412)).

[17] Docket 51, at 31.

in assessing performance, he is permitted to grade his dog without oversight from the adjunct instructor. Sergeant Nope testified that the system is designed in this way because each officer will eventually return to the field, where the officer is expected to monitor his dog's performance without constant oversight.

Similarly, Defendant argues that Utah's training program fails to properly train dogs to distinguish between the scent of narcotics and other scents commonly present in the situations in which the dogs are employed; namely, the scent of humans and cutting agents or packaging materials. Sergeant Nope testified that the training program does include the use of diversionary scents, such as human odor.[18] The Court notes that the government's apparent failure to perform discrimination testing on cutting agents could be problematic. But based on the evidence presented on this point, the Court is not persuaded that this potential deficiency is so severe as to undermine the otherwise high quality program.

Based on the foregoing, the Court finds that Defendant has failed to meet her burden to demonstrate that Jip's sniff was unreliable by challenging the adequacy of Utah's narcotics detection dog training and certification program.

B. JIP'S RELIABILITY

Defendant argues that Jip's alert in this case was not reliable because Jip (1) did not perform well in his training program, and (2) was not trained for the type of situation involved in this case.

*1. Jip's Performance in Training*

---

[18] *Id.* at 49–50.

Defendant argues that Jip's performance falls below the level of performance achieved by dogs that courts from other jurisdictions have found to be reliable. Additionally, Defendant contends that Jip's training records indicate that Jip's trainers have not attempted to improve his performance.

As discussed above, the Tenth Circuit has deferred to the expertise of canine professionals to decide whether training is adequate to produce a reliable dog. And as discussed above, Defendant has failed to undermine the presumption that Utah's training program produces reliable dogs. Therefore, the accuracy rates of dogs certified in other jurisdictions have little bearing on Jip's reliability. Moreover, the Tenth Circuit has repeatedly held that narcotics detection dogs with accuracy rates below or comparable to Jip's are sufficiently reliable to establish probable cause.[19] Defendant concedes that Jip performs at 75% accuracy, which is above the threshold set by the Tenth Circuit. Finally, although Defendant directs the Court's attention to cases involving dogs with success rates above Jip's, other circuits have also found dogs to be reliable despite having success rates below Jip's.[20] Therefore, the Court finds that

---

[19] *See, e.g.*, *Kitchell*, 653 F.3d at 1225 n.12 (affirming district court's finding that dog with 66.7% accuracy rate was reliable); *Ludwig*, 641 F.3d at 1252 ("[B]ased on historical performance, this dog's alert suggested a 58% chance of finding a seizable quantity of drugs. While we hesitate to get into the business of affixing figures on probable cause, if we were pushed to do so we would hold this to be enough."); *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997) ("The evidence indicated that Bobo correctly alerted 71% of the time in those instances where records were kept and that on those occasions where Bobo worked with Small, the dog had at least an 80% accuracy rate. We find that a 70–80% success rate meets the liberal standard for probable cause . . . .").

[20] *See, e.g.*, *United States v. Anderson*, 367 F. App'x 30, 33 (11th Cir. 2010) (unpublished) (55% accuracy); *United States v. Koon Chung Wu*, 217 F. App'x 240, 246 (4th Cir. 2007) (unpublished) (60% accuracy); *United States v. Limares*, 269 F.3d 794, 798 (7th Cir. 2001) (62% accuracy).

Defendant has failed to meet her burden to demonstrate that Jip was not reliable based on other cases involving dogs with higher accuracy rates.

Because the Court is not persuaded that Jip's accuracy is inadequate, the Court also is not persuaded by Defendant's argument that Jip was unreliable because Jip's records potentially imply that the trainers were not attempting to improve his performance. Defendant has not presented concrete evidence to support this implication and as discussed above, Jip was performing at a level adequate to obtain certification. As such, Jip's trainers were not required to improve Jip's performance in order for Jip to be deemed reliable.

*2. No Training for this Scenario*

Defendant argues that Jip's alert was not reliable because he was not trained for the situation confronted in this case. Specifically, Defendant argues that although Jip was trained to detect the odors of narcotics and humans, he was not trained to detect narcotics in an automobile that simultaneously contains humans.

As discussed above, Utah's program does train dogs to detect target odors when human odor is also present. Defendant has failed to present sufficient evidence to persuade the Court that Utah's training procedures involving human odor is inadequate.

Based on the foregoing, the Court finds that Defendant has failed to meet her burden to demonstrate that Jip's sniff in this instance was unreliable.

The Court finds that Utah's narcotics detection dog training and certification program is bona fide and Jip is reliable. In light of these findings—and Officer Smith's testimony that he observed numerous air fresheners and a suspicious amount of luggage in Defendant's vehicle—the Court concludes that the facts surrounding Jip's alert would make a reasonably prudent

person think that a search would reveal contraband or evidence of a crime. Therefore, the search of Defendant's vehicle was supported by probable cause and the evidence obtained as a result of that search will not be suppressed.

IV.  CONCLUSION

Based on the foregoing, it is hereby

ORDERED that Defendant's Motion to Suppress (Docket No. 42) is DENIED.

The time between the filing of Defendant's Motion to Suppress and this Order is hereby excluded for purposes of the Speedy Trial Act, pursuant to 18 U.S.C. § 3161(h)(1)(D), (H).

The Court will set a status conference by separate notice to establish a new trial date.

DATED this 30th day of April, 2014.

> BY THE COURT:
>
> Ted Stewart
> United States District Judge